THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : 3:21-CR-105 |
| v. | : (JUDGE MARIANI) |
| | : |
| RUSSELL TETER, | : |
| | : |
| Defendant. | : |

FILED
SCRANTON

NOV 1 2 2021

PER _____
DEPUTY CLERK

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Presently before the Court is Defendant Russell Teter's "Motion to Suppress

Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution"

(Doc. 29). Defendant is charged with Possession with the Intent to Distribute

Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). The present

Motion seeks to suppress all evidence recovered from the initial warrantless search of

Defendant's person, including all fruits obtained as a result of such search.

The Court held an Evidentiary Hearing on September 30, 2021 and the Government

presented three witnesses. At the close of the Hearing, Defendant's counsel requested

time to submit a supplemental brief that addresses issues not fully identified in previous

filings. This Court granted the request and issued an Order to that effect on September 30,

2021. (Doc. 38). The Court's Order also allowed the Government an opportunity to

respond to Defendant's filing. (*Id.* at ¶ 2). The parties have filed their post-hearing

documents (Doc. 42; Doc. 43) and this matter is now ripe for disposition.

For the reasons discussed below, the Court concludes that Detective Krammes'
limited protective search of Defendant's sweatshirt pocket area was constitutional and
performed in accordance with the Fourth Amendment.  Therefore, the Motion to Suppress
will be denied.

## II. FACTUAL BACKGROUND

On September 23, 2020, Detective Joseph Krammes of the Pottsville Bureau Police
Department observed a gold Taurus traveling on Centre Street in Pottsville, Pennsylvania
that he believed was reported stolen.  (Evidentiary Hearing Transcript ("Ev. Hr'g Tr.") at
4:24-5:6).  After running the vehicle's registration and confirming that the vehicle was in fact
reported stolen, Detective Krammes initiated a traffic stop in a parking lot adjacent to Route
61 in Pottsville, Pennsylvania.  (*Id.* at 5:7-10; 9:12-17).  Detective Krammes wore a body
camera that was turned on for the duration of the stop, except for a short period of time
when he turned it off to speak with Sergeant Mark O'Toole, which is described below.  (*Id.*
at 7:20-8:6; 14:11-15:1; *see also* Doc. 31, Def. Ex. C; Doc. 31, Def. Ex. F).

Stolen vehicle reports occur "maybe, five times a year," so after Detective Krammes
confirmed that the vehicle was, in fact, reported stolen, the Communications Center
instructed other officers to arrive on the scene to provide Detective Krammes with back up.
(*Id.* at 12:2-8).  Detective Krammes approached the driver's side of the vehicle to speak with
Defendant Russell Teter, the driver of the vehicle.  (Doc. 31, Ex. C at 00:14-00:20).
Defendant sat in the driver's seat, wearing a hooded full-zip sweatshirt, and passenger

Nicole Ott sat in the front passenger seat. (*See generally id.*).  Detective Krammes asked if

there were any weapons in the car and Defendant replied, "just my knife."  (*Id.* at 00:30-

00:40).  Detective Krammes advised Defendant not to reach for the knife and then

continued with other matters pursuant to the traffic stop.  (*Id.*; Ev. Hr'g Tr. at 75:19-20).

Defendant handed Detective Krammes his license and registration and explained

that although he reported the car as stolen, the car was returned to him and he had not yet

notified the police that his car was returned.  (Doc. 31, Def. Ex. C at 00:42-01:30).  Around

this time, multiple backup officers arrived on the scene, including Detective Joseph Welsh

and Sergeant O'Toole with the Pottsville Bureau Police Department.  (Ev. Hr'g Tr. at 75:22-

23).  After the Communications Center confirmed that the vehicle was registered to

Defendant, Detective Krammes requested that the Pennsylvania State Police respond to the

scene so they could process the vehicle.  (*Id.* at 12:15-13:4; 75:14-15; Doc. 31, Def. Ex. C

at 01:50-02:09).  Detective Krammes informed Defendant that his window tint was illegal.[1]

(Doc. 31, Def. Ex. C at 02:34-02:38; Ev. Hr'g Tr. at 13:17-14:7).

Detective Krammes walked away from the driver's side of the vehicle to speak with

Sergeant O'Toole.  (Ev. Hr'g Tr. at 14:8-20; Doc. 31, Def. Ex. C at 03:06-03:13).  At the

---

[1] Detective Krammes asked Defendant why his VIN was removed, but quickly corrected himself once he located the VIN and commented that it was difficult to see.  (Doc. 31, Def. Ex. C at 02:40-02:45; Ev. Hr'g Tr. at 67:11-21).  At the evidentiary hearing, Detective Krammes stated the VIN "was not an issue with the vehicle" and explained why he initially could not locate the VIN.  (Ev. Hr'g Tr. at 67:11-21).  Thus, there was never an issue with the VIN and it did not factor into the decisions Detective Krammes made later in the traffic stop.  (*Id.*).

3

direction of Sergeant O'Toole, Detective Krammes turned off his body camera. (Ev. Hr'g Tr. at 14:11-13).[2] Sergeant O'Toole informed Detective Krammes that Ms. Ott was recently arrested in a neighboring town for possession of a controlled substance with intent to deliver and that the Pottsville Bureau Police Department had conducted a "trash pull" at her residence the same morning of the stop. (*Id.* at 14:20-15:1). After this short conversation, Detective Krammes turned his body camera back on and approached the vehicle. (*Id.* at 15:19-22; *see generally* Doc. 31, Def. Ex. F).

While Detective Krammes spoke with Sergeant O'Toole, Detective Welsh spoke to Defendant and Ms. Ott from the passenger side of the vehicle and asked them whether they had ever been arrested, among other things. (Doc. 31, Def. Ex. D at 02:07-03:00). As Detective Welsh spoke with Defendant and Ms. Ott, Detective Krammes went back to the driver's side of the vehicle and asked Defendant to get out of the car. (Ev. Hr'g Tr. at 17:3-7; Doc. 31, Def. Ex. F at 00:22-00:24). Defendant asked, "For what?" and "Why?" and Detective Krammes responded that he had the authority to ask him to exit the vehicle

---

[2] Detective Krammes turned off his body cam for a brief conversation with Sergeant O'Toole and he testified that it is standard practice to shut off body cams "when we talk about strategy or, maybe, other pending cases[.]" (Ev. Hr'g Tr. at 8:2-6). In this particular instance, Sergeant O'Toole explained:

> I just wanted to make [Detective Krammes] aware there was recent drug activity concerning the front passenger of the vehicle and that there was an ongoing investigation. That's why I turned my body cam off that time, too, to discuss that with him, because it was an ongoing investigation, at that time, for our department.

(*Id.* at 108:18-109:7).

because his car was reported stolen and because of the vehicle's illegal tint. (Ev. Hr'g Tr. at 17:22-18:3; Doc. 31, Def. Ex. F at 00:25-00:39).

While remaining seated in the vehicle, Defendant reached over to the glove box to put away his documents and then brought his right hand across his stomach area, where Detective Welsh observed him grabbing or reaching at a bulge in his sweatshirt. (Ev. Hr'g Tr. at 89:16-21; Doc. 31, Def. Ex. D at 03:05-03:09; Doc. 31, Def. Ex. F at 00:39-00:45). Upon seeing this, Detective Welsh said, "Don't hide anything Mr. Teter. Mr. Teter, do not hide anything, okay. This is not the time to play games. Okay?" (Ev. Hr'g Tr. at 34:5-9, 98:3-10; Doc. 31, Def. Ex. D at 03:09-03:22). When Detective Krammes heard Detective Welsh instruct Defendant to not hide anything, he looked at Defendant's stomach and saw a bulge in Defendant's sweatshirt pocket area. (Ev. Hr'g Tr. at 17:22-18:23).

Detective Krammes asked Defendant, "What are you hiding in your pocket here?" and then reached through the open driver's side window and grabbed the object creating the bulge in Defendant's sweatshirt pocket area. (*Id.* at 17:22-18:3; Doc. 31, Def. Ex. F at 00:47-00:50). Detective Krammes testified that once he grabbed the object, Defendant "clenche[d] his forearm against the sweatshirt to try and conceal more of what was in that sweatshirt pocket area." (Ev. Hr'g Tr. at 18:4-18:7). Detective Krammes asked Defendant "What is this? What is this?," to which Defendant responded, "It's my cigarettes." (*Id.* at 18:4; Doc. 31, Def. Ex. F at 00:49-01:00). Detective Krammes replied, "It's not cigarettes. What do you have in here?" (Doc. 31, Def. Ex. F at 00:49-01:00). Finally, Detective

Krammes successfully removes the object from underneath Defendant's sweatshirt, revealing a package of methamphetamine wrapped plastic and wrapped again in paper. (*Id.* at 01:00-01:02; Ev. Hr'g Tr. at 18:7-15).

Detective Krammes then placed Defendant under arrest and removed him from the vehicle. (Doc. 31, Def. Ex. F at 01:03-01:18). Detective Krammes performed a search incident to arrest on Defendant and found two resealable bags of methamphetamine, $1,900 in cash, and a cell phone. (*Id.* at 01:28-02:50; Affidavit of Probable Cause, Doc. 30-2, Ex. A at 3). Defendant was transported to City Hall where he was *Mirandized* and interrogated. (Affidavit of Probable Cause, Doc. 30-2, Ex. A at 3).

The Pottsville Police Department impounded Defendant's vehicle and applied for a search warrant for the vehicle. (*See generally id.*). Detective Krammes submitted an affidavit of probable cause in support of the warrant and described the incident as follows:

> Backup arrived and Det. Welsh approached the passenger side of the vehicle. I then asked Teter to step out of the vehicle. Teter began grabbing at something at his stomach area, when Det. Welsh yelled at him to stop reaching for something. Teter continued to reach for something at his stomach area, where I observed a large bulge near his stomach area and also began to yell at him to stop reaching for something. Due to the size of the bulge at his stomach area, which had the appearance of a handgun, and Teter's failure to stop grabbing at that area, I grabbed onto the item and separated it from Teter for my safety. At that time, I observed the item as a large amount of crystal substance.

(*Id.* at 3). On September 29, 2020, a magistrate judge issued the search warrant for Defendant's vehicle. (*Id.* at 1). Detective Krammes searched Defendant's vehicle, which revealed approximately one pound of methamphetamine. (Ev. Hr'g Tr. at 77:20-24).

6

### III. ANALYSIS

In his filings to the Court and at the Evidentiary Hearing, Defendant argues that

Detective Krammes "executed an illegal warrantless search of Russell Teter's person" and

"asks the Court to suppress the fruits of this search." (Doc. 30 at 2). Each event of

consequence is discussed in turn.

#### a. Initial Traffic Stop

The Fourth Amendment provides that individuals shall not be subject to

"unreasonable searches and seizures." U.S. Const. amend. IV. "The United States

Supreme Court has held that stopping a car and detaining its occupants is a seizure under

the Fourth Amendment. However, a stop to check a driver's license and registration is

constitutional when it is based on an 'articulable and reasonable suspicion that . . . either

the vehicle or the occupant' has violated the law." *United States v. Johnson*, 63 F.3d 242,

245 (3d Cir. 1995) (internal citations omitted); *see also United States v. Delfin-Colina*, 464

F.3d 392, 396 (3d Cir. 2006) (noting that reasonable suspicion applies to traffic stops).

Here, the parties do not dispute that Detective Krammes conducted a constitutional

traffic stop of Defendant. Detective Krammes did not initiate the traffic stop until he

confirmed with the Communications Center that the vehicle was reported stolen, at which

time he had "articulable suspicion that criminal activity [was] afoot." *Illinois v. Wardlow*, 528

U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also United States v.*

*Gardner*, 2013 WL 5918313, at *4 (W.D.Pa. Nov. 1, 2013) ("It is well established that

7

officers are permitted to pull over a car suspected of violating any applicable vehicular traffic laws, such as a report that a vehicle was stolen.  No further suspicion of criminal activity by the driver of the vehicle or the passengers therein is necessary to justify the *Terry* stop of the vehicle." (internal citations omitted)).  Therefore, the initial *Terry* stop of Defendant was constitutional.[3]

As the traffic stop progressed, Detective Krammes asked Defendant to exit the vehicle.  Defendant does not argue that this was unconstitutional or otherwise improper. Although Defendant never exited the vehicle on his own volition, Detective Krammes acted within his authority to ask Defendant to exit the vehicle.  *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 2013) ("A police officer may order the driver of a lawfully stopped car to exit the vehicle." (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)).

### b. Search of Defendant's Sweatshirt Pocket Area

Defendant's central argument in his Motion to Suppress is that Detective Krammes conducted an unlawful search of his stomach area and, as such, the fruits of that search should be suppressed.  (Doc. 30 at 1; Doc. 42 at 1).  Defendant contends that "Detective Krammes did not execute a routine patdown or frisk" and that "the search he performed was not strictly circumscribed" to a limited protected search for weapons.  (Doc. 42 at 10).

---

[3] The Court notes that Detective Krammes' grounds for the traffic stop permissibly evolved once he exited his patrol car and observed Defendant's windows had an illegal tint.  (Ev. Hr'g Tr. at 13:17-14:4); *see also United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) ("Once a traffic stop is initiated, 'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.'" (citing *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

A police officer can conduct a limited protective search or frisk for weapons "where he has a reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27; *see Arizona v. Johnson*, 555 U.S. 323, 326 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop, . . . the police must harbor a reasonable suspicion that the person subjected to the frisk is armed and dangerous."). Such an intrusion is only permissible when the officer can identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.  When faced with an officer's protective search of an individual for weapons, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the inference in the first place." *United States v. Pittman*, 338 F. App'x 147, 149 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20).

"Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Delfin-Colina*, 464 F.3d at 396 (quoting *Wardlow*, 528 U.S. at 123).  To determine the constitutionality of a protective frisk for weapons, the court must look to the "totality of the circumstances – the whole picture" to assess whether the officer had an individualized and objective basis for his suspicion. *Gardner*, 2013 WL 591813, at *5 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *see also Pittman*, 338 F. App'x at 149 (noting that the court performs the "assessment objectively, focusing on whether the facts available to the

9

officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate").  Many factors play into the determination of reasonable suspicion, including "location, history of crime in the area, a suspect's nervous or evasiveness and police officers' common sense judgments and inferences about behavior." *United States v. Connolly*, 349 F. App'x 754, 757 (3d Cir. 2009) (internal citations omitted); *see also United States v. Robertson*, 305 F.3d 164, 167 (3d Cir 2007) (noting that police officers can rely on their "knowledge, experience, and common sense judgments about human behavior" in the reasonable suspicion determination).

### i. Initiation of the Terry Search

At the Evidentiary Hearing, Detective Krammes described the series of events that culminated in his search of Defendant's sweatshirt pocket area.  Detective Krammes testified that this was not a "plain old traffic stop" and instead, "it was a felony traffic stop due to theft of a motor vehicle."  (Ev. Hr'g Tr. at 66:16-17).  In response to a question on cross examination regarding Detective Krammes' "understanding of [his] legal authority" to search Defendant, Detective Krammes testified:

> Okay. Again, he admitted to having a weapon on him already in his vehicle or possession.  I don't know if he states it's in the door or not at that time.  And he was very calm and cordial until I asked him to get out of the vehicle, and that's when Detective Welsh says, Stop trying to hide something, and his hands are near his area where I now see a bulge.
>
> Okay, so, at that point, I have fear that there's a weapon there, and that's why I reach in and grab it.  That's why I did what I did.

(*Id.* at 70:1-9).  Detective Krammes further explained:

10

I saw a vehicle that looked similar to a stolen vehicle, I made a U-turn, I ran the registration. It came back as the stolen vehicle. Then the vehicle then pulled into a safe parking lot, so I activated my overhead lights to conduct a vehicle stop on the stolen vehicle.

I got out and made contact with the driver who identified himself as Russell Teter. I then asked county who the vehicle came back to. They said, Russell Teter. At that point, I did say, Slow your response but still come, because there's still something going on here, because the vehicle is reported stolen and the driver is there. That's why I said still come.

While speaking with him, I asked if he had a weapon, he said Yes, he has a knife. I said, don't reach for it. I took possession of his keys so he couldn't drive away from the scene. And then once Detective Welsh arrived on-scene, I went back to talk to Sergeant O'Toole. He then notified me of the possible drug activity involving the passenger.

At that point is when I went up, I looked through the back seat – that's when I couldn't look through the back window to see if she attempted to hide anything in the back window, but I couldn't really see, the windows were very dark. So then I went over – he said, Why don't you get Russell out and speak to him. So, first, I looked at the window, then I went over and I asked him to step out, and he started says, Well, why do I have to? Why do I have to do this? I said, Well, A, your car is reported stolen, B, your tint is illegal. So either way, I have the legal right to ask you to step out of the car, that's my legal right as a police officer.

And he was like, No, I don't want to get out, or something along those lines, which is starting to draw suspicion, there's something going on here, more than what I'm aware of, because there's not reason for him – at this point, you would think he would be happy to say, Yeah, I got my car back, he – there's something going on here.

Then, my partner sees [Defendant] go toward his center area, he says, Stop hiding something, at this point. I'm thinking, hiding something, reaching for something, I believe that's what I wrote. At that point, I say, What are you hiding? What are you hiding? He does not give me an answer. I reach in, I see the bulge, I reach in, he has his hands right there, like, his hands are – I mean, it's a split-second reach to go up and grab whatever is in that bulge, and I didn't want that to happen.

11

> So I grabbed it and I pulled it out, and at that point, I saw – I recognized
> it as what I suspected to be meth.

(*Id.* at 75:8-77:2).

These factors, including the stolen vehicle report, Defendant's admission of having a knife, and Defendant not wanting to exit the car, all contributed to Detective Krammes belief that Defendant was armed and dangerous.

At the Hearing, Detective Krammes made it clear that he did not see Defendant's reach that prompted Detective Welsh to tell Defendant to not hide anything and, instead, Detective Krammes acted on Detective Welsh's observations of Defendant's behavior. (*Id.* at 35:17-23). Defendant takes issue with the fact that it was Detective Welsh, not Detective Krammes, who saw Defendant grab at the bulge in his sweatshirt. (Doc. 42 at 8 ("That is, Detective Krammes heard Detective Welsh say, "Don't hide anything, Mr. Teter,' although Krammes himself had not seen Teter 'hiding anything or grabbing anything or reaching for anything, at all.'")). Defendant argues, "Krammes testified that he did not see Teter's nudging movement that prompted Detective Welsh's admonishment of Teter; [and] that he did not use his hands to grab, reach, or hide anything thereafter" to support his contention that Detective Krammes' search exceeded the bounds of a *Terry* frisk. (*Id.* at 11-12).

Defendant's argument is ultimately inconsequential to the Court's analysis. The collective knowledge doctrine explains that the knowledge of each officer involved in an investigative *Terry* stop "should be imputed to others jointly involved in executing the stop."

*United States v. Whitfield*, 634 F.3d 741, 745-46 (3d Cir. 2010) (quoting *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002)).  Although Detective Krammes did not see Defendant make the grabbing or reaching motion, Detective Welsh communicated Defendant's "general behavior" to Detective Krammes through his admonishment of Defendant.  *See United States v. Calloway*, 571 F. App'x 131, 138 (3d Cir. 2014) (holding that while the officer did not see all of the behavior at issue, "the other officers communicated Calloway's general behavior to him; Lorenzo could therefore rely on the observations of his fellow officers, as well as his own observations, in assessing the risk that Calloway was armed and dangerous").  As the Third Circuit articulated in *Whitfield*, "[i]t would make little sense to decline to apply the collective knowledge doctrine in a fast-paced, dynamic situation such as we have before us, in which the officers worked together as a unified and tight-knit team."  634 F.3d at 746.  Therefore, Detective Krammes permissibly and reasonably relied on the information communicated to him by Detective Welsh regarding Defendant's movements.

Detective Krammes also testified that he relied on his experience and knowledge as a police officer to justify the search of Defendant.  A few months prior to the incident at issue in this case, Detective Krammes dealt with a similar situation where "a lump in a similar type of sweatshirt turned out to be a weapon."  (Ev. Hr'g Tr. at 19:8-11).  Detective Krammes explained:

> **A**. That was approximately, five or six months before this incident, we were – I know it was like dead in the middle of COVID.  And I was, again, a detective, but I was riding with a corporal, and we got called to an overdose, and the guy was slumped over on the sidewalk.

13

And she started questioning him about what was in the lump in his middle sweatshirt pocket, and he said, Oh, it's paperwork, and he pulled out a couple pieces of paper. She goes, No, that's not it, she reached in and grabbed it. She goes Oh, my God, he's got a gun. So I reached in and grabbed it, and at that point, I felt the muzzle right on me, and we were able to get the gun away from him.

…

**Q**. And in that particular case, was the clothing, the outer clothing similar to that that Mr. Teter had on on September 23 of 2020?

**A**. Yes it was.

(Ev. Hr'g. Tr. at 19:14-20:7). Detective Krammes testified that the bulge in Defendant's sweatshirt "looked identical" to the one he observed in the situation described above and this comparison added to his belief that the concealed object was a weapon. (Ev. Hr'g Tr. at 79:10-19); *see also United States v. Yamba*, 596 F.3d 251 (3d Cir. 2007) (noting that an officer who "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous" may "conduct a carefully limited search of the outer clothing of such persons" (quoting *Terry*, 392 U.S. at 30)).

In sum, (1) the stolen vehicle report, (2) Defendant admitting to a knife in the car, (3) Defendant's reluctance to exit the vehicle, (4) Detective Krammes' prior experience as a police officer, including a specific incident that was similar to this one, (5) Detective Welsh seeing Defendant grab at his sweatshirt pocket area and then yell "Don't hide anything, Mr. Teter," (6) Detective Krammes' observance of the bulge near Defendant's sweatshirt

pocket, and (7) Defendant's hands not leaving his waist area all contributed to Detective Krammes' belief that Defendant was armed and dangerous. These facts and observances about Defendant's behavior and the traffic stop as a whole are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a limited protective search for weapons. *Moorefield*, 111 F.3d at 13. The Court finds that, based on the specific facts articulated by Detective Krammes, "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *See Terry*, 392 U.S. at 27. Therefore, Detective Krammes had reasonable suspicion that Defendant was armed and dangerous, and the *Terry* frisk of Defendant was properly initiated. [4]

### ii. Scope of the Terry Search

Next, the Court must determine whether Detective Krammes' search was reasonably limited in scope. It is undisputed that during the search at issue, Detective Krammes reached his hand through the driver's side window and only searched Defendant's sweatshirt pocket area, where he found a wrapped package of methamphetamine. Defendant contends, "even assuming *arguendo* that Krammes was motivated by self-

---

[4] Defendant cites to *Adams v. Williams*, 407 U.S. 143 (1973) in support of his argument that "Detective Krammes' uncircumscribed search was not justified by any other exigent circumstance." (Doc. 42 at 11, 14-15). While Defendant structures his discussion of *Williams* in terms of exigent circumstances, the *Williams* factors analyzed by Defendant are better understood as factors that gave rise to the officer's determination of reasonable suspicion instead of "exigencies." As such, the Court fully addressed this argument in its discussion of Detective Krammes' determination of reasonable suspicion.

protection, the search he performed was not strictly circumscribed to that purpose" and argues the protective search was not reasonably limited in scope.  (Doc. 42 at 7, 10-11).

In *Minnesota v. Dickerson*, the Supreme Court held that "police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*" "as long as the officers' search stays within the bounds marked by *Terry*."  508 U.S. 366, 373 (1993); *see also United States v. Graves*, 877 F.3d 494, 499-500 (3d Cir. 2017) ("While the purpose of this limited search is not to discover evidence of crime, the Supreme Court has held that an officer may seize contraband detected during the lawful execution of such a search under the plain feel doctrine." (internal quotations omitted)).

When the Third Circuit applied *Dickerson*'s plain feel doctrine, it held that to decide whether the scope of a protective search for weapons was proper, "the areas of focus should be whether the officer had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk."  *Yamba*, 506 F.3d at 259.[5]  The *Yamba* Court explained:

---

[5] The Third Circuit explained that *Dickerson* identified weapons as the proper target of a *Terry* search and "reject[ed] a narrow focus on how quickly and certainly the nature of an object felt during a *Terry* search is known and on how much manipulation of a person's clothing is acceptable." *Yamba*, 506 F.3d at 258 (citing *Dickerson*, 508 U.S. at 373).  The Third Circuit stated:

> The proper question under *Dickerson*, therefore, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon.  That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search.

*Id.* at 259.

Assuming that an officer is authorized to conduct a *Terry* search at all, he is authorized to assure himself that a suspect has no weapons.  He is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon.  If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search.  If, indeed, he discovers contraband, the officer may seize it, and it will be admissible against the suspect.

*Id.*; *see also United States v. Johnson*, 452 F. App'x 219, 226 (3d Cir. 2011) ("If the officer develops probable cause to believe, given his training and experience, that an object is contraband before he eliminates the possibility that it is a weapon, he may lawfully perform a more intrusive search[.]").  The scope of a protective search must be limited to the outer clothing of the searched individual "'in an attempt to discover weapons which might be used to assault [the officer].'"  *Graves*, 877 F.3d at 499 (quoting *United States v. Navedo*, 694 F.3d 164, 167 (3d Cir. 2007)).

Here, Detective Krammes discovered the methamphetamine "during a properly executed *Terry* search." *Johnson*, 452 F. App'x at 226 (citing *Yamba*, 506 F.3d at 259).  He had reasonable, articulable suspicion that Defendant was armed and dangerous and he conducted a limited search of the bulge in Defendant's sweatshirt, as opposed to a more expansive search of Defendant's person.  Detective Krammes testified that he fully expected the bulge to be a weapon, explaining:

Q. In what way did it have the appearance of a handgun?

A. It was a larger bulge, and it was in the center of his thing – like I testified earlier, I had a very similar situation about six months prior, it looked identical

17

to that situation, and when I – I never expected it to be that much – when I tell you this is the biggest drug arrest I've ever had, the half pound would have been the biggest drug arrest I've ever had. I've never seen that much meth in person. So I was not expecting it to be narcotics, at that point. I thought it was a weapon.

**Q.** You thought it was a weapon. You had no reason to believe it was narcotics?

**A.** That is correct.

**Q.** You had never seen an item that was narcotics that was like this, at all?

**A.** That is correct.

**Q.** So you went for the grab, solely, because you suspected Mr. Teter was armed and dangerous; correct?

**A.** Yes, I wanted to control the weapon.

(Ev. Hr'g Tr. at 79:10-80:3). Detective Krammes agreed that the object felt "solid, like a handgun" because the plastic bags of methamphetamine, itself a hard crystal substance, "were wrapped together in one wrapping." (*Id.* at 81:15-18, 82:5-15).

Detective Krammes was unable "to eliminate the possibility that the object [was] a weapon" until he pulled it out of Defendant's sweatshirt and looked at it. *Yamba*, 506 F.3d at 259. Stated differently, the moment Detective Krammes discovered that the object was not a gun was the same moment that he developed probable cause to believe the object was contraband. *See id.* at 260 ("It is not key whether Livingstone was certain that the object in Yamba's pocket was contraband by the time he knew it not to be a weapon; what

is key is whether Livingstone has probable cause to believe that it was and this occurred at the same moment or before he determined that Yamba had no gun on his person.").

It is reasonable that, in the "hasty examination necessitated by a protective search," Detective Krammes believed the wrapped package of methamphetamine in Defendant's sweatshirt was a gun. *See United States v. Edwards*, 53 F.3d 616, 619 (holding that the officer could have reasonably believed that an envelope with nineteen plastic credit cards and identification cards and had the feel of a "hard, bulky object" contained a small gun). Detective Krammes properly initiated and executed the protective search of Defendant's sweatshirt pocket area within the bounds marked by *Terry* and its progeny.

In support of his Motion to Suppress, Defendant cites to *Sibron v. New York*, 392 U.S. 40 (1968) to argue, "'the search was not reasonably limited in scope … to the protection of the officer by disarming a potentially dangerous man.'" (Doc. 42 at 7, 11 (quoting *Sibron*, 392 U.S. at 65-66)). In *Sibron*, the Court held that the officer's search was not supported by reasonable suspicion that the defendant was armed and dangerous and the nature and scope of the search was impermissibly broad. 392 U.S. at 64-65. The officer in *Sibron* made "no attempt at an initial limited exploration for arms" before he "thrust his hand into [the defendant's] pocket and took from him envelopes of heroin." *Id.* at 65. The Court held that "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception – the protection of the officer by disarming a potentially dangerous man." *Id.*

19

*Sibron* is clearly distinguishable from the case at bar.  At the outset, the officer in

*Sibron* did not have a reasonable, articulable suspicion that the defendant was armed and

dangerous, nor did he conduct a limited protective search of the defendant's outer clothing

before searching the defendant's pockets.  *Id.* at 63-65.  Here, Detective Krammes had

reasonable suspicion that Defendant was armed and dangerous and instead of "thrust[ing]

his hand into [Defendant's] pocket," Detective Krammes limited his search to the bulge in

Defendant's sweatshirt pocket area, which is the place in which Detective Krammes

believed Defendant could be concealing a weapon.  Unlike the officer in *Sibron*, Detective

Krammes made an "attempt at a limited exploration for arms" and did not search any other

part of Defendant's person until he was placed under arrest.  *See id.* at 65.

Defendant also cites to *United States v. Hall*, 193 F. App'x 125 (3d Cir. 2006), in

support of his argument that Detective Krammes' search was not sufficiently limited in

scope.  (Doc. 42 at 6-7, 11).  The officer in *Hall* observed two bulges in the pockets of the

defendant's jeans and, during the patdown of the defendant, she felt that a "wad" but did not

know what it was.  *Hall*, 193 F. App'x at 127.  The officer "did not testify that the bulges in

[the defendant's] front pockets were particularly large or unusual" and "there [was] nothing

in [the officer's] testimony to suggest that she assumed the bulge was actually a weapon."

*Id.* at 130.  She then "put her hand in the pocket and was able to sense that it was neither a

gun nor an open needle, but was still unable to exactly identify what constituted the 'wad' in

Hall's pocket."  *Id.*  The officer pulled out the wad and found paper money in one pocket and

crack cocaine in the other. *Id.* The Third Circuit held that the officer's search exceeded the bounds of *Terry* because a reasonable police officer "would have been able to conclude that the money and cocaine contained in [the defendant's] pockets were not weapons by the time she placed her hands inside of the pockets. Thus there was no need to remove the items and inspect them further." *Id.* at 130-31.

Like *Sibron*, *Hall* is easily distinguishable from this case. Detective Krammes did not indiscriminately remove every item Defendant had in his pockets; rather, he removed the only item that he reasonably believed was a weapon. *See Hall*, 193 F. App'x at 131 ("[The officer's] indiscriminate removal of every bulging object when conducting the protective pat-down search was unconstitutional.").

Additionally, Detective Krammes gave the following testimony on cross examination:

**Q**. And as represented there, and I assume is accurate, the total and complete – totally and completely your suspicion was that the bulge was an – it had the appearance of a handgun; is that correct?

**A**. That is correct.

**Q**. Is that your testimony?

**A**. That is my testimony.

**Q**. In what way did it have the appearance of a handgun?

**A**. It was a larger bulge, and it was in the center of his thing – like I testified earlier, I had a very similar situation about six months prior, it looked identical to that situation, and when I – I never expected it to be that much – when I tell you this is the biggest drug arrest I've ever had, the half pound would have been the biggest drug arrest I've ever had. I've never seen that much meth in

person.  So I was not expecting it to be narcotics, at that point.  I thought it was a weapon.

**Q**. You thought it was a weapon.  You had no reason to believe it was narcotics?

**A**. That is correct.

(Ev. Hr'g Tr. at 79:3-22).  Unlike the officer in *Hall*, who knew the "wad" in the defendant's pocket was not a weapon, Detective Krammes believed the bulge in Defendant's sweatshirt was a weapon.  (*Id.* at 79:3-22, 81:15-18).  He testified, "the only mass I've ever felt like that in a sweatshirt that someone tried to hide was a handgun" and he agreed that the object and felt "solid like a handgun."  (*Id.* at 18:13-15).  "Non-weapon contraband will not be suppressed where an officer feels a 'hard, bulky object' and seizes it on the belief that it is a gun."  *United States v. Thach*, 411 F. App'x 485, 489 (3d Cir. 2011) (citing *Edwards*, 53 F.3d at 619).  Detective Krammes felt a "hard, bulky object" in Defendant's sweatshirt, which supported his belief that the object was a weapon.  Even though Detective Krammes was unsure of what exactly Defendant concealed in his sweatshirt, "'an officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"  *Moorefield*, 111 F.3d at 14 (citing *Terry*, 392 U.S. at 27).  The Court finds that, given the factors that contributed to Detective Krammes determination of reasonable suspicion, a "reasonably prudent man in the circumstances would be warranted in the belief" that the object in Defendant's sweatshirt pocket area was a weapon.

Finally, Defendant contends that "Detective Krammes did not pat down or frisk Teter" and instead, "he 'attempt[ed] to reach in and seize an item [from Teter], whatever it was.'" (Doc. 42 at 7 (citing Ev. Hr'g Tr. at 47:22-25, 48:1-3)). This argument focuses on the subjective intentions of Detective Krammes, which is not a proper line of inquiry for the Court. Indeed, the "subjective motive or intent [of the officer] is not relevant for *Terry* purposes." *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006); *see also Pittman*, 338 F. App'x at 149 ("Whether Deputy Kurten intended or was prepared to undertake the frisk in the absence of these events is not relevant, under *Terry*, to our objective assessment of whether the frisk was reasonable when performed."); *United States v. Acosta*, 965 F.2d 1248, 1253 (3d Cir. 1992) ("The Supreme Court pointed out ... that the first step in evaluating alleged violations of the Fourth Amendment is 'an objective assessment of an officer's actions in light of the facts and circumstances then known to him.'") (quoting *Scott v. United States*, 436 U.S. 128, 137 (1978)).

The Court finds that Detective Krammes had an objective, reasonable suspicion that Defendant was armed and dangerous, and the scope of his search was limited to the area in which Detective Krammes had a reasonable suspicion that Defendant had a weapon. It is immaterial that on cross examination, Detective Krammes agreed that "[t]his was not a pat and frisk, this was a grab and seize" because Detective Krammes' subjective characterization of his actions does not control the Court's analysis. (Ev. Hr'g Tr. at 70:19-21); *see Terry*, 392 U.S. at 21-22 ("And in making that assessment it is imperative that the

23

facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?") (internal citations omitted); *see also Acosta*, 965 F.2d at 1254 (explaining that a law enforcement officer's 'subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional'") (quoting *Scott*, 436 U.S. at 136).  The Court finds that Detective Krammes' limited search of Defendant's sweatshirt pocket area for weapons was objectively reasonable and, thus, did not violate the Fourth Amendment.

Detective Krammes lawfully stopped Defendant's vehicle, developed reasonable suspicion that Defendant was armed and dangerous, properly initiated a *Terry* protective search for weapons, properly limited the scope of the protective search to Defendant's outer clothing (and, more specifically, his sweatshirt pocket area), and remained well within the bounds marked by *Terry* and its progeny during the search.  Consequently, the package of methamphetamine recovered by Detective Krammes during the protective search for weapons, the resealable bags of methamphetamine, cash, and the mobile phone recovered during the search incident to arrest, and the additional one pound of methamphetamine found during the execution of the search warrant for Defendant's vehicle will not be suppressed.  Therefore, Defendant's Motion to Suppress will be denied.

## IV. CONCLUSION

For the aforementioned reasons, Defendant Teter's Motion to Suppress (Doc. 29) will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge